**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

In re:                          :
                                :
**PATRICK McHUGH,**             :        Chapter 11
                                :
                                :        Case No. 03-30291(DWS)
            DEBTOR              :


# DISCLOSURE STATEMENT
# DATED OCTOBER 16, 2003


Paul J. Winterhalter
DiDonato & Winterhalter, P.C.
1818 Market Street
Suite 3520
Philadelphia, PA  19103
(215) 564-4119
Counsel for Debtor

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| PATRICK McHUGH, | : | Chapter 11 |
| | : | |
| | : | Case No. 03-30291(DWS) |
| DEBTOR | : | |

**DISCLOSURE STATEMENT**
**DATED OCTOBER 16, 2003**

## I.   INTRODUCTION

### A.   Background

    Patrick McHugh, hereinafter referred to as "Debtor", is a individual who has been engaged in Bankruptcy Proceedings since the filing of a Voluntary Petition under Chapter 11 of Title 11 of the United Stated Code on July 7, 2003.  The bankruptcy reorganization proceeding is pending before the Honorable Diane W. Sigmund, United States Bankruptcy Judge for the Eastern District of Pennsylvania, under Case No. 03-30291(DWS).

    Since the bankruptcy filing, the Debtor has continued in the legal possession of his assets and in control of the operation of her financial affairs pursuant to the authority set forth in Sections 1107 and 1108 of the Bankruptcy Code.  The Debtor now submits this Disclosure Statement dated October 16, 2003 supporting a Plan of Reorganization dated October 16, 2003.  The Plan dated October 16, 2003 shall hereinafter be referred to as the "Plan," and this Disclosure Statement shall be referred to as the "Disclosure Statement."

The Debtor firmly believes its Plan as filed provides for the optimum payments to creditors within the shortest practical and realistic period of time giving consideration to the creditors, the Debtor's resources, and financial abilities.   A copy of the Plan as now proposed is annexed hereto as Exhibit "A."

### B.   Purpose of Disclosure Statement

The Debtor provides this Disclosure Statement to all creditors and parties in interest, including the Office of the United States Trustee, pursuant to §1125 of Title 11 of the United States Code, for the purpose of providing adequate information about the Debtor, his financial position, earnings abilities, and resources and in support of soliciting acceptances to the Debtor's Plan of Reorganization.

Previously, this Disclosure Statement has been submitted to the Bankruptcy Court for review and comment by any creditor or interested party and, after notice to all creditors and other interested parties of a hearing, and the occurrence of that hearing, it was determined that the Disclosure Statement contained such information as was reasonably practical under the circumstances of this case to permit you to make an informed judgment about the voting on the proposed Plan.   The approval by the Bankruptcy Court of the Disclosure Statement means that the Statement contains "adequate information" for creditors of the Debtor to vote on the Plan.

2

Pursuant to §1125(a)(1) of the Bankruptcy Code, adequate
information is defined as "information of a kind, and in
sufficient detail as far as is reasonably practical in light of
the nature and history of the Debtor, and the condition of the
Debtor's books and records that would enable a hypothetical
reasonable investor, typical of holders of claims or interests of
the relevant class, to make an informed judgment about the Plan."
No statements or information concerning the Plan or the
transactions contemplated thereby have been authorized, other
than statements or information contained in this Disclosure
Statement and the information accompanying this Disclosure
Statement.  All other statements regarding the Plan and
transactions contemplated thereby, whether written or oral, are
not authorized.  Approval of this Disclosure Statement by the
Bankruptcy Court, however, does not indicate the Bankruptcy Court
recommends either acceptance or rejection of the Plan.

You are strongly urged to read the Disclosure Statement
because it contains important information concerning the Debtor's
history, investments, results of operation, and material
litigation.  The Disclosure Statement also summarizes and
analyzes the Plan and presents certain forecasts and projections
with respect to the post-effective date operations along with
alternatives to the Plan.  Please read the Plan fully and obtain
independent professional advice if you deem it necessary.  The
definitions contained in the Plan apply to this Disclosure
Statement, and each recipient hereof is urged to review the

3

provisions of the Plan prior to reviewing the Disclosure

Statement and keep it available for reference during your review

of the Disclosure Statement.

For the Plan, as proposed, to be enforceable against all

creditors of the Debtor, including your claim, it is necessary

for the Debtor to gain acceptance of the Plan.  A Plan will be

deemed accepted if two-thirds in amount and one-half in the

number of allowed claims of each class of impaired claims

designated in the Plan indicate a willingness by affirmative vote

to accept the terms of treatment as described in the Plan.  Based

on the foregoing, the Debtor submits the Disclosure Statement to

provide each creditor entitled to vote with sufficient

information concerning the background, assets, and proposed

future operations, financing, and indebtedness of the Debtor in

order to permit the creditor, such as yourself, to make an

informed decision about the exercise of your right to vote in

favor of the Debtor's Plan.

### C.   **Voting Instructions**

Accompanying this Disclosure Statement is a copy of the

Bankruptcy Court Order approving the Disclosure Statement and the

Voting Procedures.  The Order directs important time  limitations

connected with the solicitation of your approval of the Debtor's

Plan, including the time in which each creditor must be sent this

information, the last date for filing written acceptance or

rejections to the Plan by those claimants eligible to vote, the

last date for filing and service of written objections to the

4

confirmation of the Plan, fixing a date on which a report must be
made on Plan voting and fixing the day and time for a hearing on
the Confirmation of the Plan.

Claimants of the Debtor who are to be paid in full under the
Plan and under the terms permitted by the Bankruptcy Court are
conclusively presumed to have accepted the Plan, and solicitation
of their acceptance is not required.  Votes are being solicited
only from those classes whose claims may be impaired under the
Plan.  It is important for you to exercise your right to vote,
since the majority in number and two-thirds in amount of the
solicited claimants who actually vote may bind those who do not
vote.  An eligible claimant who does not vote for acceptance or
rejection of the Plan will have no bearing on the outcome of
voting.

Further, it is important to know that, notwithstanding
minimal requirements for voting for the acceptance by each
individual creditor of an impaired class, the Bankruptcy Court
may, on a request of the proponent of the Plan, confirm the Plan
if it does not discriminate unfairly, and is fair and equitable
with respect to each class of impaired claimants.  If the Plan,
or a modification thereof is not accepted by one or more impaired
classes of claims held by creditors and is not confirmed by the
Court, the Debtor may be unable to secure the necessary funds to
repay its obligations.  This Disclosure Statement discusses this
as an alternative.  You are advised to read the relevant sections
below.

THE PLAN IS PROPOSED BY THE DEBTOR.  THE DEBTOR URGES
ALL CREDITORS TO VOTE IN FAVOR OF THE PLAN BECAUSE IT PROVIDES
THE GREATEST AND EARLIEST POSSIBLE RECOVERY TO CREDITORS
REASONABLY OBTAINABLE.  YOUR VOTE IN FAVOR OF THE PLAN IS
RECOMMENDED BECAUSE THE PLAN MAXIMIZES THE VALUE OF AND MINIMIZES
DELAY IN RECOVERIES BY ALL CREDITORS.  IT ALLOWS CREDITORS TO
PARTICIPATE IN DISTRIBUTIONS IN EXCESS OF THOSE THAT WOULD BE
AVAILABLE IF THE DEBTOR WERE LIQUIDATED UNDER CHAPTER 7 OF THE
BANKRUPTCY CODE.

## II.   BACKGROUND OF THE DEBTOR

### A. PRIOR TO BANKRUPTCY

The Debtor is an individual who was stricken with a
debilitating illness which prevented him from functioning in
society or continuing with his employment.  Prior to his extended
illness the Debtor had engaged in various jobs and self
employment in the State of Alaska.  The Debtor had acquired
certain parcels of real estate and had contemplated developing
the tract of land into single family homes.  Unfortunately, due
to his reoccurring illness which gradually became worse, the
Debtor was forced to return to the Philadelphia area and reside
with family members as his condition worsened.  The Debtor had
previously acquired title to a parcel of real estate in Marple
Township, Delaware County and was constructing a new home on the
property when his health conditions worsen to the point his was
only able to function for approximately one hour per day.  This
prevented him from participating in any gainful employment and
cause his inability to generate income to pay his living expenses
and the expenses related to the Delaware County property. Since

the property had a mortgage, with no income, the mortgage came in default, and foreclosure litigation commenced. This litigation eventually required the Debtor to seek relief under the United States Bankruptcy Code.

## B.   EVENTS SINCE THE BANKRUPTCY FILING

Immediately following the filing, the Debtor arranged to visit his original homeland in Ireland and make plans to convalesce at Long Term Assisted Living Facility in that country. The Debtor, being an Irish immigrant, desires to live what likely will be his final days in that Country. Shortly following his arrival in Ireland, the Debtor's illness worsen which required him immediate hospitalization. He has since been released from the hospital and remains under a doctor's care. His prognosis for recovery is not favorable.

Anticipating the illness may cause the incapacity of the Debtor, at the time of executing the Bankruptcy papers, Mr. McHugh also executed a durable Power of Attorney designating his pre-petition legal counsel to act in his stead for the purpose of effectuating what may be required if the Debtor became unable to act on his own. The immediate plan was to sell the Marple Township Property and if successful, use the proceeds from the sale to fund the Plan and pay creditors. Through some good fortune, the property was offered for sale and the Debtor has received a viable offer for its purchase.

7

### III.   ASSETS & LIABILITIES OF THE DEBTOR

#### A.   Assets

The Debtor instituted the Chapter 11 Bankruptcy proceeding
to protect his assets.  The principal assets of the Debtor
includes his interest in the partially reconstructed property
located 2890 Old Cedar Grove Road in Broomall, Marple Township,
Delaware County, Pennsylvania.  The Debtor also owns interests in
undeveloped parcels of land in Alaska and some real property
located in Ireland. Otherwise, the Debtor owned very little
assets having any value.  He lived a very frugal life. He does
own a car and a mobile home which are each housed in Ireland. He
also has an open bank account in Alaska and had his own personal
clothing.  Mr. McHugh lived with his family at his sister's home
who cared for him for the last several months.  He has no
furniture or other personal belongings.  He only received a
social security check which he turned over to his sister to pay
for food and assist in any household expenses.

The Debtor was involved in litigation concerning the Marple
Township Property prior to the commencement of the Bankruptcy
which included a substantive claims on his behalf against Willow
Grove Bank and certain real estate brokers involved in the
original acquisition.  The Debtor sought relief for certain
violations of the Pennsylvania Fair Trade Practices Act and for
certain alleged breaches of fiduciary duties owed to the debtor.
The claims against the brokers was actually settled prior to the
commencement of the case, but was not completed as a result of

8

the intervening bankruptcy.

**B.**   Liabilities

The Debtor has limited liabilities. The primary reason for
filing the Bankruptcy was the inability to meet the loan
obligations to Willow Grove Bank who had provided for acquisition
and construction financing for the Maple Township property.
Willow Grove Bank is owed approximate $260,000. On its loan which
amount is secured with a mortgage on the subject property.
Additionally, a title search of the property reflects a lien held
by the Internal Revenue Service for approximately $28,218 which
is attributable to 1985 personal income taxes which apparently
were not paid by the Debtor.  The Debtor disputes the amount of
this claim which it will desire to resolve in conjunction with
this Bankruptcy Case. The only other scheduled creditor of the
Debtor are the pre-petition legal fees which were outstanding to
the Debtor's State Court counsel This claim totaled $11,845.00


**IV.   SUMMARY OF THE PLAN**

The Debtors proposed plan classifies the creditors
claims as follows:

1.   Class I:   Shall consist of all allowed claims of
administrative costs and expenses incurred subsequent to July 7,
2003 as defined and provided under 11 U.S.C. §503.

2.   Class II:   Shall consist of the allowed and priority

9

unsecured claims entitled to such priority treatment pursuant to
11 U.S.C. §507(a), if any.

3.     Class III: Shall be the secured claim of Willow Grove
Bank holding a mortgage on the Debtor's property located at 2890
Old Cedar Grove Road in Broomall, Pennsylvania.

4.     Class IV: Shall be the claim of the Internal Revenue
Service on its tax lien.

5.     Class V: Shall be the general unsecured claims of
creditors who hold Allowed Claims against the Debtor.


The Debtor's Plan further provides that these creditors will
receive the following treatment:

1.     Class I - Administrative Claims:

Each holder of a Class I Claim of the Chapter 11 case
shall be paid in full on the earliest date from or after the
Effective Date that it is or becomes an Allowed Claim, or is
allowed by Final Order, or shall be paid upon such terms as may
be agreed between the respective administrative claimant and the
Debtor.   Included in this class is the administrative expense
claim for professional legal fees due to the counsel for the
Debtor, DiDonato & Winterhalter, P.C.  The counsel shall be
required to file a Fee Application to gain the requisite
authorization to allow the payment of these fees.   **This class is
not impaired.**

10

2.    <u>Class II – Priority Unsecured Claims:</u>

The Class II Priority Unsecured Claims, if any, shall be paid in full in cash on the Plan effective date or when their existing claims may become due.    **This class is not impaired.**

3.    <u>Class III –Secured Claim of Willow Grove Bank:</u>

Willow Grove Bank holds a mortgage lien on the Debtor's Maple Township Real Estate.    The Plan contemplates the property will be sold and the mortgage claim satisfied under the terms of the pre-petition settlement agreement previously reached with the Bank. **This claim is not impaired.**

4.    <u>Class IV –Lien Claim of the Internal Revenue Service:</u> The Debtor and his professionals are presently unaware of the details or legitimacy behind this claim.    The Debtor, through counsel will investigate the legitimacy of the claim and object to the claim if required.    Otherwise, any valid portion of the claim will be paid from the proceeds of the sale of the property. **This Class is not Impaired.**

5.    <u>Class V – General Unsecured Claims:</u>

The Debtor shall pay all allowed claims of general unsecured claims in full in cash, as soon as practical following confirmation of this plan and the satisfaction of all mortgage and valid lien creditors and all administrative claims of the bankruptcy case including any claim for fees due to the Office of the United States Trustee. **This Class is not impaired.**

11

### V.   EFFECT OF CONFIRMATION

Upon the Effective Date, all of the provisions of this Plan shall be binding upon the Debtor, upon all creditors, and all entities who are affected or whose interests are affected in any manner by this Plan.

### VI.   FINANCING THE PLAN

The Debtor's principal source of funding for the Plan is from the sale of the Maple Township Property.  The property is under agreement and is required to close on or before November 14, 2003.  Time is therefore of the essence and the Debtor will request the Bankruptcy to limit the time creditors have to review this disclosure statement and vote on the plan to meet these stringent deadlines.  A true and correct copy of the Real Estate Agreement of Sale id appended to this Disclosure Statement as Exhibit B.

### VII.   EFFECT OF CONFIRMATION

#### H.   Legal Effects of the Plan

A)   Revesting of Assets.  Subject to the provisions of this Plan, the property of the estate of the Debtor not sold will revert in the reorganized Debtor on the Confirmation Date.  On the Confirmation Date, all such property of the Debtor will be free and clear of all liens, claims, interests, and encumbrances except as otherwise provided in the Plan.  Following the payment

12

of monies due to WGB under the Plan, all liens, and claims of WGB
shall be satisfied and removed. From and after the confirmation
Date, the reorganized Debtor may attend to his financial affairs,
and may use, acquire and dispose of property free from any
restrictions of the Bankruptcy Code, except as otherwise provided
in the Plan.

B)   Section 1141 Discharge.  Except as provided in the
Plan or in the Confirmation Order, the rights afforded under the
Plan and the treatment of claims under the Plan will be in
exchange for and in complete satisfaction, discharge, and release
of all claims including any interest accrued on claims from the
Petition Date.  Except as provided in the Plan or the
Confirmation Order, confirmation will discharge the Debtor from
all claims or other debts that arose before the Confirmation Date
and all debts of the kinds specified in Sections 502(g), 502(h),
and 502(I) of the Bankruptcy Code, whether or not a Proof of
Claim based on such debt is filed or deemed filed pursuant to
Section 501 of the Bankruptcy Code or a claim on such debt is
allowed pursuant to §502 of the Bankruptcy Code.

C)   Automatic Stay.  The Automatic Stay which is
imposed upon the filing of the bankruptcy petition pursuant to 11
U.S.C. §362(a) shall remain in full force and effect consistent
with the provisions of 11 U.S.C. §362(c).

D)   Post Confirmation Professional Fees.  Professional
fees incurred by any professional retained by the Debtor pursuant
to 11 U.S.C. §327 for services rendered subsequent to the

13

effective date of the Plan shall not be subject to application
before or approval by the United States Bankruptcy Court.  Post
confirmation fees may be paid by the Reorganized Debtor, or from
his property, upon the appropriate billing by Counsel for the
Debtor.  All professional fees incurred by the Debtor in
Possession for services rendered prior to the Effective Date of
the Plan are subject to Bankruptcy Court Approval and to the
payment deferral detailed above.

      E.   <u>Retention of Jurisdiction</u>.  Upon the confirmation of
the Debtor's Plan, the Bankruptcy case is deemed concluded.
Pursuant to 11 U.S.C. §350(a) and Federal Bankruptcy Rule 3022,
the Bankruptcy Court shall enter a Final Decree closing the case
when it is fully administered.  Local Rule 5009.1 of the Local
Rules of Bankruptcy Procedure for the Eastern District of
Pennsylvania requires the Clerk to give notice to  close the case
180 days after a final Order confirming the Plan, unless reasons
are stated by counsel to keep the case open.  Notwithstanding the
foregoing, the Bankruptcy Court shall retain jurisdiction with
respect to the following matters:

           (a)  To enable the Debtor to consummate any and
all proceedings which it may bring, prior to the entry of an
Order of Confirmation, to set aside liens or encumbrances, to
recover assets or damages to which they may be entitled under
applicable provisions of the Bankruptcy Code or other federal,
state or local laws;

(b)   To adjudicate all controversies concerning the classification or allowance of any claim;

(c)   To herein determine all claims arising from the rejection of any executory contract, including leases, and to consummate the rejection and termination thereof, or with respect to any executory contract to which an application for rejection or termination is filed prior to the entry of an Order of Confirmation;

(d)   To liquidate damages in connection with any disputed, contingent or unliquidated claim;

(e)   To adjudicate all claims to a security or ownership interest in the property of the debtor or in any proceeds thereof;

(f)   To fix the allowance of professional compensation or other administrative expenses incurred by the Debtor from the commencement of the case until the effective date, provided an application is filed within thirty (30) days of the effective date of the Plan;

(g)   To consider any amendments or modifications to the Plan;

(h)   To adjudicate and determine any cause of action provided for under the Plan, provided that any such action for the purposes of adjudication under the Bankruptcy Code shall be commenced prior to the entry of an Order of substantial compliance or six (6) months after the Order of confirmation, whichever occurs first; and to make such orders as is necessary

15

and/or appropriate to carry out and enforce the provisions of
this Plan or as otherwise may be authorized pursuant to 11 U.S.C.
§1142.

F.    **Modification of the Plan**

   The Debtor reserves the right in accordance with
the Bankruptcy Code to amend or modify the Plan at any time prior
to the confirmation date.  After the confirmation date, the
Debtor may, upon an Order of the Bankruptcy Court pursuant to 11
U.S.C. §1127(d) of the United States Code, remedy any defect or
omission or reconcile any inconsistencies in the Plan in such
manner as may be necessary to carry out the purposes and intent
of the Plan.

G.    **Revocation or Withdrawal of the Plan**

   The Debtor reserves the right to revoke or withdraw the
Plan at any time prior to the confirmation date.  If the Debtor
revokes or withdraws the Plan, then the Plan will be deemed null
and void and nothing contained in the Plan will be deemed to
constitute a waiver of any claim by or against the Debtor or any
other entity or shall prejudice in any manner the rights of the
Debtor or any entity in any further proceedings involving the
Debtor.

16

## VIII.    **REORGANIZED DEBTOR**

Pursuant to 11 U.S.C. §1123(a)(7) and §1129(a)(5), the proponent of a Plan is required to disclose the identity and affiliations of any individual proposed to serve after the confirmation of Plan as a director of the Debtor. Since the Debtor is an individual, these provisions have limited application in this case.  The Debtor shall retain possession of any remaining assets following the sale of the Maple Township property after confirmation of the Plan.

In order to satisfy interests which are consistent with those of the creditors and public policy, the Debtors pledges to act as a fiduciary to assure that creditors receive all payments to which they are entitled under the Plan.

## IX.   **DISBURSING AGENT**

James Hennessey, Esquire shall act as disbursing agent pursuant to the Plan of Reorganization and shall manage and control the disbursement of all Plan payments of the Debtor while any Plan funding obligations are outstanding.  The Disbursing Agent shall and agrees to comply with all requirements of Local Rule 3021-1 of the Local Rules of Bankruptcy Procedure for the Eastern District of Pennsylvania including the filing of all reports for all distributions.  The proposed Disbursing Agent is a licensed Attorney with the Dilworth, Paxson, LLP law firm in the Commonwealth of Pennsylvania and as a result it is proposed that no bond should be required pursuant to Local Rule 3016-

17

1(e)(3). The Disbursing Agent shall be compensated by the Debtor
for services rendered as the Disbursing Agent at his normal
billing rates submitted on a monthly basis or as services are
provided.

### X. CONFIRMATION IF ANY CLASS REJECTS THE PLAN

The Debtor presents that the instant Plan has been
proposed in good faith, does not discriminate unfairly and is
fair and equitable.  In the event that any class of creditors
rejects this proposed Plan, it is the intention of the Debtor to
seek the implementation and confirmation of the Plan pursuant to
the provisions of 11 U.S.C. §1129(b).

### XI.   TREATMENT OF CLAIMS

No date has been set to establish a deadline for the filing
of claims. The Debtor will review all claims and determine which,
if any, should be objected to. Certain creditors may file
objectionable claims subsequent to the submission of this
Disclosure Statement.  The Debtor reserves the right to object to
any claims.  All Objections with respect to any claim shall be
filed within sixty (60) days of the Confirmation Date or
otherwise shall be waived.

### XII. LIQUIDATION ANALYSIS

The Debtor's Plan is premised on the belief that a
liquidation under Chapter 7 of the Bankruptcy Code would not

provide for as great a return to all creditors of the Debtor as
is provided in this Plan.  If this Plan is not confirmed, the
case converted, and a Trustee appointed, there would be an
additional layer of administrative costs and expenses which would
reduce annual payments to the present unsecured creditors.   The
Debtor believes  this Plan provides the most reasonable and
realistic approach to satisfaction of the allowed claims in the
most efficient manner.  The Plan provides for full payment to
unsecured creditors. If a Trustee appointed, it is likely the
prospective purchaser would be lost and there is no guarantee
this buyer would wait of that a Trustee could get a similar
purchaser. The Plan certainly provides a greater return than
would be received by unsecured creditors under a Chapter 7
liquidation.

### XIII.   FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS

        The tax consequences of the Plan to holder of a claim
will depend, in part, on the constituency of claims, the type of
consideration received in exchange for the claim, whether the
holder is a resident of the United States for tax purposes,
whether the holder reports income on an accrual or cash basis
method, and whether the holder receives distribution under the
Plan in one or more taxable year.  Holders of claims are strongly
advised to consult their tax advisers with respect to the tax
treatment of their particular claims under the Plan.  Holders of
claims which do not constitute tax securities, should generally

19

recognize gain or loss to the extent the amount realized under
the Plan in respect to their claims exceeds, or is exceeded by
the respective tax basis of the claims.  The amount realized for
this purpose will generally equal the sum of cash or the fair
market value of any consideration received under the Plan and in
respect to their claim.  The amount realized with respect to any
debt obligation received by an accrual based taxpayer, however,
should generally equal the obligations principal amount, as
determined for tax purposes.  Any gain or loss recognized on the
exchange will be capital or ordinary, depending on the status of
the claim in the holder's hands.  The holders aggregate tax basis
for any consideration received under the Plan will generally
equal the amount realized.  The holding period for any
consideration received under the Plan will generally begin on the
day following the receipt of such consideration.

While the foregoing is intended only as a summary of
certain federal income tax consequences of the Plan, and is not a
substitute for tax planning with a tax professional, the above
discussion is for informational purposes only and is not tax
advice.  **TAX CONSEQUENCES IN MANY CASES ARE UNCERTAIN AND MAY
VARY DEPENDING ON THE HOLDERS INDIVIDUAL CIRCUMSTANCES.
ACCORDINGLY, HOLDERS OF ANY CLAIMS OR INTEREST ARE URGED TO
CONSULT WITH THEIR TAX ADVISERS ABOUT THE FEDERAL, STATE LOCAL
AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, OR ANY
DISTRIBUTION YOU MAY RECEIVE UNDER THIS PLAN.**

NO OPINION OF COUNSEL HAS BEEN SOUGHT OR OBTAINED WITH
RESPECT TO ANY TAX CONSEQUENCES OF THE PLAN, AND NO TAX
OPINION IS GIVEN OR AUTHORIZED BY THIS DISCLOSURE
STATEMENT.   NO RULING OR DETERMINATIONS OF THE INTERNAL
REVENUE SERVICE OR OF ANY TAXING AUTHORITY HAS BEEN
OBTAINED OR SOUGHT WITH RESPECT TO THE PLAN AND THE
ABOVE DESCRIPTION IS NOT BINDING UPON THE IRS OR ANY
OTHER TAXING AUTHORITY.

## XIV. CONCLUSION AND RECOMMENDATION

The Debtor strongly recommends that all creditors receiving a ballot vote in favor of the Plan.   The Debtor believes the Plan maximizes recovery to all creditors and thus is in their best interest.   The Plan as structured, among other things, allows creditors to participate in distributions in excess of those that would be received for the case converted and the Debtor's assets liquidated pursuant to a proceeding under Chapter 7 of the Bankruptcy Code or in the alternative where the Debtor's case is dismissed.   For the reasons as stated, the Debtor believes that confirmation and consummation of this Plan is preferable to all other alternatives and urges creditors who are entitled to vote to vote in favor of the Plan.

Respectfully submitted,

FOR THE DEBTOR:
DiDonato & Winterhalter, P.C.

BY: _____
PAUL J. WINTERHALTER
COUNSEL FOR DEBTOR

DATED: October 16, 2003

21

# AGREEMENT OF SALE

THIS AGREEMENT OF SALE (the "Agreement") is made and entered into as of this __31__ day of July, 2003 by and between **PATRICK McHUGH**, an individual residing at 613 Cambridge Road, Springfield, Delaware County, Pennsylvania 19064 (the "Seller") and **JOHN CHAMBERS and MAUREEN CHAMBERS**, husband and wife, residing at 545 Tasker Avenue, Norwood, Delaware County, Pennsylvania 19074 (collectively, the "Purchaser").

## RECITALS

WHEREAS, Seller is the owner of real property located in Marple Township, Delaware County, Pennsylvania, commonly known as 2890 Old Cedar Grove Road, as further described in **Exhibit "A"** hereto, together with any and all buildings, improvements, appurtenances, water rights, mineral rights, privileges, benefits and easements belonging or pertaining to the land and any and all right, title and interest, if any, of Seller in and to the land lying in the bed of any streets, roads, avenues, alleys or passageways, open or proposed, bounding or abutting the land (collectively the "Property"); and

WHEREAS, upon and subject to the terms and conditions of this Agreement, Purchaser desires to purchase the Property from Seller; and

WHEREAS, upon and subject to terms and conditions of this Agreement, Seller is willing to sell the Property to Purchaser.

NOW, THEREFORE, in consideration of the covenants and agreements hereinafter contained, and intending to be legally bound hereby, the parties hereto agree as follows:

1.    **SALE.** Upon and subject to the terms and conditions of this Agreement, Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller, the Property.

2.    **PURCHASE PRICE.**

(a)    Purchase Price. The purchase price for the Property shall be Three Hundred Sixty Thousand ($360,000.00) Dollars (the "Purchase Price"), payable by Purchaser as follows:

(i)    Ten Thousand Dollars ($10,000.00) upon execution of this Agreement to be held in escrow by Escrow Agent (as hereinafter defined) in accordance with Section 2(b).

(ii)    The balance of the Purchase Price shall be payable at Closing in the manner set forth in Section 3(b)(i)

(b)    Earnest Money Deposit. The Ten Thousand Dollars ($10,000.00) deposit made by Purchaser shall be held by the title insurance company insuring Purchaser's title to the

Property ("Escrow Agent") at Closing (as defined in Section 3(a) below). The initial deposit and any interest earned thereon shall be referred to collectively as the "**Earnest Money Deposit**". At Closing, the Earnest Money Deposit shall be paid to Seller and credited to the Purchase Price. If Closing does not occur, then the Earnest Money Deposit shall be paid as provided in this Agreement.

3.    **CLOSING**.

(a)    Closing Date. The closing of the transaction contemplated hereby (the "**Closing**") shall occur at 10:00 A.M. on or before October 15, 2003, in the offices of Dilworth Paxson LLP, 3200 Mellon Bank Center, 1735 Market Street, Philadelphia, Pennsylvania 19013, but in any event within thirty (30) days after the approval of this Agreement of Sale by the United States Bankruptcy Court, Eastern District of Pennsylvania as more fully described in Section 17 hereof. The term "Closing" means the date in which all documents have been executed and delivered for recording and the sales proceeds are available to Seller.

(b)    Closing Procedure. At Closing:

(i)    Purchaser shall deliver to Seller, in addition to any other items required by this Agreement:

(1) the balance of the Purchase Price, payable by bank check, certified check or wire transfer of federal funds and

(2) Purchaser's affidavit addressed to Purchaser's title insurance company ("Title Company") if requested by the Title Company.

(ii)    Seller shall deliver to Purchaser, in addition to any other items required by this Agreement:

(1)    a special warranty deed for the Property, duly executed and acknowledged by Seller in proper form for recording;

(2)    a non-foreign transferor certification pursuant to Section 1445 of the Internal Revenue Code;

(3)    owner's affidavit of title addressed to the Title Company; and

(4)    a quitclaim assignment of all permits and approvals, contracts and other items relating to the Property in a form reasonably acceptable to the parties.

(c)    Possession. Seller shall deliver actual and sole possession of the Property to Purchaser upon Closing.

504091_1

4.    **TITLE**.

(a)    Real Property. At Closing, Seller shall convey to Purchaser fee simple title to the Property free and clear of all liens, encumbrances and easements, excepting, however, all existing deed restrictions, building restrictions, ordinances, easements of roads, easements visible upon the ground, easements of record, privileges or rights of public service companies and all other matters of record. Otherwise, the title to the Property shall be good and marketable and such as will be insured by the Title Company at regular rates.

(b)    Closing Costs. (i) At Closing, Seller shall pay the following closing costs:

(i)    one-half of the cost of all transfer taxes due on the recording of the Deed.

(ii)    At Closing, Purchaser shall pay the following closing costs:

(1)    the premium for the title insurance policy;

(2)    the cost of recording the Deed; and

(3)    one-half of the amount of all transfer taxes due on the recording of the Deed; and

(4)    the amount of any escrow or closing fee charged by the Title Company or other closing agency.

5.    **PRORATIONS**. Real estate taxes due and payable with respect to the Property in the year of Closing shall be prorated between Seller and Purchaser as of Closing.

6.    **RISK OF LOSS**. The entire risk of loss or damage to the Property by fire or other casualty or by condemnation or other eminent domain proceeding until Closing shall be borne and assumed by Purchaser. Purchaser is hereby advised that it may insure its equitable interest in the Property.

7.    **REAL ESTATE AGENTS**

Seller and Purchaser each represent to the other that he or they have not engaged or otherwise utilized any real estate agent in connection with this transaction. Seller and Purchaser hereby agree to indemnify, defend and hold harmless the other from and against any and all claims, fees, commissions, and suits of any real estate agent with respect to services claimed to have been rendered for or on behalf of such party in connection with the execution of this Agreement or the transaction set forth herein. The indemnities contained in this Section 7 shall survive Closing.

8.    **DEFAULT**. In the event of any material default on the part of either party under this Agreement which continues for ten (10) days after receipt of written notice from the other party

3

11. **GOVERNING LAW**. This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania.

12. **SUCCESSORS AND ASSIGNS**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

13. **TIME OF ESSENCE**. The time for Closing and all other times contained herein shall be of the essence.

14. **TENDER**. Formal tender of an executed Deed and Purchase Price is hereby waived, but nothing herein shall be deemed a waiver of the obligation of Seller to execute, acknowledge and deliver the Deed to the Property or the concurrent obligation of Purchaser to pay the balance of the Purchase Price.

15. **COUNTERPARTS**. This Agreement may be executed in any number of counterparts, each of which shall be an original, and such counterparts together shall constitute one and the same instrument.

16. **CONDITION OF PROPERTY**. Purchaser agrees to accept the Property in its "AS-IS, WHERE IS" condition on the date of Closing after having had the opportunity to inspect and otherwise investigate the Property to Purchaser's satisfaction. Purchaser hereby releases, quitclaims and forever discharges Seller and any other person, firm or corporation who may be liable by or through them, from any and all claims, losses or demands, including, but not limited to, personal injuries and property damage and all of the consequences thereof, whether now known or not, which may arise from the presence of termites or other wood boring insects, radon, lead-based paint hazards, environmental hazards, any defects in any sewage disposal system or water service system, or any defects in or conditions on or of the Property. This release shall survive Closing. Notwithstanding the foregoing, nothing contained in this Section 16 shall be deemed to waive any rights which Purchaser may have under the Pennsylvania Real Estate Seller's Disclosure Act or the Residential Real Estate Transfer Law. Purchaser acknowledges having received a copy of Seller's disclosure under the Pennsylvania Real Estate Seller's Disclosure Act.

17. **BANKRUPTCY COURT APPROVAL**. Seller's obligation to sell the Property to Purchaser hereunder shall be conditioned upon Seller's receipt of the approval to do so on the terms and conditions set forth in this Agreement of Sale from the United States Bankruptcy Court, Eastern District of Pennsylvania ("Court"). Seller and Purchaser agree to comply with any reasonable conditions imposed by the Court, so long as such conditions do not increase, in the case of Purchaser, or decrease, in the case of Seller, the Purchase Price or other monetary obligations of the parties hereunder. Seller shall promptly submit a fully executed copy of this Agreement to the Court for its approval and shall use diligent, good faith efforts to obtain such approval. If such approval has not been obtained by November 1, 2003, either party hereto (so long as the terminating party is not in default hereunder) may terminate this Agreement upon written notice to the other, whereupon the Earnest Money Deposit shall be returned to Purchaser, including any interest thereon. Thereafter, the parties shall have no further liability or obligation under this Agreement.

18.  **MORTGAGE CONTINGENCY.** Purchaser's obligations under this Agreement shall be contingent upon Purchaser's receipt of a mortgage commitment as set forth herein. Within seven (7) days of the date of this Agreement, Purchaser shall apply for a mortgage in the principal amount of $ 360,000 00 \_\_\_\_\_ for a term of 30 years at an interest rate not to exceed 7 % per annum and with points and fees not to exceed 2 \_\_\_\_\_ Dollars ("Mortgage") on lender's standard form and Purchaser shall use its best efforts to obtain the Mortgage. The Purchaser shall supply all necessary information and fees required by the proposed lender and shall authorize the lender to communicate with the involved attorneys.

A written mortgage commitment for the mortgage must be delivered by Purchaser to Seller or Seller's agent no later than thirty (30) days after the date of this Agreement. If Purchaser has not obtained the Mortgage by such date, the commitment date shall automatically be extended until Purchaser obtains the Mortgage or until Seller notifies the Purchaser in writing that the extension is terminated. If the extension causes the commitment date to extend beyond the date for Closing hereunder, then the date for Closing hereunder shall be extended for seven days after the revised commitment date. If the Mortgage commitment is not delivered to Purchaser by the specified date or any extended date permitted by the Seller (or if Seller terminates any extension of the commitment date), this Agreement shall be deemed null and void. In that event the deposit monies paid by the Purchaser shall be returned to the Purchaser unless failure to obtain the Mortgage commitment is the result of the Purchaser's negligence or intentional conduct or failure to diligently pursue the Mortgage application.

IN WITNESS WHEREOF, the parties hereto have hereunder set their hands as of the date and year set forth above.


SELLER:

Patrick McHugh

Witness:_____    By: James W Hennessey attorney in fact
                              Patrick McHugh


PURCHASER:

Witness:_____    By: John Chambers
                              John Chambers


Witness:_____    By: Maureen Chambers
                              Maureen Chambers


504091_1

6

# EXHIBIT "A"

## LEGAL DESCRIPTION OF REAL PROPERTY

504091_1

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected,
Hereditaments and Appurtenances, Situate in the Township of Marple, County of Delaware and State of
Pennsylvania, described according to a Final Plan of Property for Clement C. O'Rourke, Jr., made by Howard W.
Doran, Inc., and Associates, Registered Surveyor, Newtown Square, Pa., dated April 4, 1980 and last revised
August 8, 1980 described as follows, to wit:

BEGINNING at a point on the Southwesterly side of Old Cedar Grove Road (50 feet wide) measured the (2)
following courses and distances from a point marking the intersection of the Centerline of Old Cedar Grove
Road with the title line of the bed of Barclay Avenue: (1) extending from said point of intersection along the said
Centerline of Old Cedar Grove Road, South 32 degrees 49 minutes 50 seconds East 331.70 feet to a point; and
(2) South 57 degrees 32 minutes 10 seconds West 25 feet to the point and place of beginning; thence extending
from said beginning point along the said Southwesterly side of Old Cedar Grove Road South 32 degrees 49
minutes 50 seconds East 25 feet to a point; thence extending South 57 degrees 32 minutes 10 seconds West
561.71 feet to a point in line of lands now or late of Philadelphia Suburban Water Company; thence extending
along same the (2) following courses and distances: (1) North 32 degrees 40 minutes 40 seconds West, 205.64
feet to a point; and (2) North 57 degrees 48 minutes 50 seconds East 251.76 feet to a point; thence extending
South 32 degrees 27 minutes 50 seconds East 179.42 feet to a point; thence extending North 57 degrees 32
minutes 10 seconds East 310.56 feet to the first mentioned point and place of beginning.

BEING Lot No. 3 as shown on said Plan.

BEING the same premises which Andrew Rufo and Loretta Mazzenga, Robert Mazzenga and Helen Rufo, by
Indenture bearing date the 19th day of January, A.D. 1984 and recorded in the Office for the Recording of
Deeds, in and for the County of Delaware, aforesaid, in Volume 134 page 1490 &c., granted and conveyed unto
Patrick McHugh, in fee.

BEING Folio No. 25-00-00708-04.

EXCEPTING THEREOUT AND THEREFROM (IF ANY) THE PREMISES AS MORE FULLY DESCRIBED IN THE
FOLLOWING DEED: NONE

# DILWORTH PAXSON LLP

## LAW OFFICES

DIRECT DIAL NUMBER:                                                    James W. Hennessey
(215) 575-7160                                                    jhennessey@dilworthlaw.com

September 24, 2003

Mr. and Mrs. John Chambers
545 Tasker Avenue
Norwood, PA 19074

    Re:   Premises:    2890 Old Cedar Grove Road, Marple Township,
                           Delaware County, Pennsylvania .

Dear Mr. and Mrs. Chambers:

    Please consider this letter as an addendum to the Agreement of Sale for the above-captioned property dated July 31, 2003.

    Paragraph 3(a) of the Agreement of Sale is hereby amended to read as follows:

"3.    **CLOSING.**

    (a)    Closing Date. The closing of the transaction contemplated hereby (the "Closing") shall occur at 10:00 a.m. on or before November 14, 2003 in the offices of Dilworth Paxson LLP, 3200 Mellon Bank Center, 1735 Market Street, Philadelphia, Pennsylvania 19103, but in any event within thirty (30) days after the approval of this Agreement of Sale by the United States Bankruptcy Court for the Eastern District of Pennsylvania as more fully described in Section 17 hereof. The term "Closing" means the date in which all documents have been executed and delivered for recording and the sales proceeds are available to Seller."

    In all other respects, the terms and conditions of the Agreement of Sale dated July 31, 2003 shall remain in full force and effect.

    Please confirm your agreement to the amendment to Paragraph 3(a) of the Agreement of Sale by signing the enclosed copy of this letter and returning it to me.

511518_1

3200 MELLON BANK CENTER · 1735 MARKET STREET · PHILADELPHIA PA 19103-7595
(215) 575-7000 · FAX (215) 575-7200 · www.dilworthlaw.com

CHERRY HILL NJ    HARRISBURG PA    NEPTUNE NJ    NEWTOWN SQUARE PA    WASHINGTON DC    WILMINGTON DE

Mr. and Mrs. John Chambers
September 24, 2003
Page 2

 

If you have any questions with respect to the amendment to the Agreement of Sale, please contact me.

Very truly yours,

James W. Hennessey

Agreed to and Accepted this _9_ day of ___October___, 2003.

John Chambers

Maureen Chambers

JWH:def

cc:    Paul J. Winterhalter, Esquire
       Leo M. Pall, Jr., Esquire

511518_1